UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN RE:      CIRCUIT CITY STORES, INC.,          Case No. 08-35653
            *et al.*,                           Chapter 11
                  Debtors.                      (Jointly Administered)

_____

ALFRED H. SIEGEL, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust

            Plaintiff,

v.                                              APN 10-03317-KRH

RUSSELLVILLE STEEL COMPANY, INC.

            Defendant.

_____


## MEMORANDUM OPINION

Alfred H. Siegel (the "Plaintiff"), in his capacity as Trustee of the Circuit City Stores, Inc. Liquidating Trust, initiated this Adversary Proceeding against Russellville Steel Company, Inc. (the "Defendant") to avoid and recover several transfers made by Circuit City Stores, Inc. and its affiliated debtors (collectively, "the "Debtor"),[1] in the ninety days immediately preceding the Petition Date (the "Preference Period"). In its Answer [Docket No. 5] to the Plaintiff's Complaint [Docket No. 1], the Defendant asserted that the transfers that occurred during the Preference Period were not avoidable as they were made in the ordinary course of business.

---

[1] The affiliated debtors were as follows: Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., InterTAN, Inc., Ventoux International, Inc., Circuit City Purchasing Company, LLC, CC Aviation, LLC, CC Distribution Company of Virginia, Inc., Circuit City Properties, LLC, Kinzer Technology, LLC, Abbott Advertising Agency, Inc., Patapsco Designs, Inc., Sky Venture Corp., PRAHS, INC., XSStuff, LLC, Mayland MN, LLC, Courchevel, LLC, Orbyx Electronics, LLC, and Circuit City Stores PR, LLC. The respective bankruptcy estates of the affiliated debtors were substantively consolidated pursuant to the Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims [Docket No. 8252 in case No. 08-35653] (the "Plan of Liquidation").

1

Trial was held on February 21, 2012.  Upon consideration of the Stipulation of Undisputed Facts, the legal memoranda submitted by the parties, and the argument and evidence offered at trial, the Court finds that the transfers made by the Debtor to the Defendant do not fall within the ordinary course of business exception set forth in § 547(c)(2) of the Bankruptcy Code.[2]  This memorandum opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[3]

The Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), and (O), in which final orders or judgments may be entered by a bankruptcy court.  Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Facts and Procedural Posture[4]

The Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code on November 10, 2008 (the "Petition Date"), and continued to operate as a debtor-in-possession pursuant to §§ 1107 and 1108. On September 14, 2010, the Court entered an order confirming the Plan of Liquidation,[5] which created the Circuit City Stores, Inc. Liquidating Trust and appointed Alfred H. Siegel as Trustee [Docket No. 8555 in case No 08-35653].  The Trustee has the sole authority to pursue claims transferred to the Trust by the Debtor through the Plan of

---

[2]  Unless otherwise specified, all code sections referenced in this opinion are sections from Title 11 of the United States Code.  11 U.S.C. §§ 101 *et seq*. (2011) (the "Bankruptcy Code").

[3]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

[4]  All factual disputes in this matter were resolved by the parties and set forth in a Stipulation of Undisputed Facts filed with the Court prior to trial.  *See* Stipulation of Undisputed Facts [Docket No. 11].

[5]  The Plan of Liquidation is identified and defined *supra* at note 1.

Liquidation and to litigate objections to claims asserted against the Debtor's substantively consolidated estate. The Plan of Liquidation became effective on November 1, 2010.

Prior to the commencement of the bankruptcy case, the Debtor was a leading specialty retailer of consumer electronics and operated a nationwide chain of electronics stores. As of the Petition Date, the Debtor employed approximately 39,600 employees and operated 712 retail stores and nine outlet stores throughout the United States and Puerto Rico. The Defendant is a corporation specializing in steel fabrication based in Russellville, Arkansas. On August 30, 2006, the Debtor and the Defendant entered into a Procurement and Services Agreement under which the Defendant provided steel products to the Debtor (the "Agreement"). Invoices submitted to the Debtor under the Agreement were on "Net 30" terms, which required the Debtor to pay the invoice within thirty days of the invoice date. The Debtor paid eighty-six invoices over the entire course of its business with the Defendant.

Beginning in November 2007, the Debtor experienced a significant change in its liquidity that caused it to delay making payments to its vendors (the "Liquidity Event"). Between the consummation of the Agreement on August 30, 2006, and the Liquidity Event, the Debtor received and paid forty-four invoices submitted by the Defendant. Excluding five payments that drastically deviated (for reasons not relevant here) from the parties' general course of conduct, the thirty-nine remaining payments that the Debtor made to the Defendant during this period all occurred between thirty-one and forty-one days after the invoice date. The average of the days-to-pay these thirty-nine invoices was 33.49 days.

Between the Liquidity Event and the beginning of the Preference Period on August 11, 2008, the Debtor received and paid thirty-eight invoices submitted by the Defendant. Excluding one aberrant payment, the remaining thirty-seven payments that the Debtor made to the

3

Defendant during this period all occurred between forty-four and fifty-one days after the invoice date. The average of the days-to-pay these thirty-seven invoices was 46.74 days.

The Debtor paid four invoices submitted by the Defendant, totaling $124,261, during the Preference Period (the "Preference Payments"). Invoice 27414, in the amount of $3,432, was issued by the Defendant on April 21, 2008, and was paid by the Debtor 189 days later on October 27, 2008. Invoice 27514, in the amount of $1,100, was issued on July 16, 2008, and was paid fifty-one days later on September 5, 2008. Invoice 27509, in the amount of $112,922, was issued on July 25, 2008, and was paid forty-five days later on September 8, 2008. Invoice 27548, in the amount of $7,978, was issued on August 18, 2008, and was paid forty-six days later on October 3, 2008. The average of the days-to-pay the four Preference Payments was 82.75 days.

On December 3, 2008, the Defendant filed a proof of claim in the amount of $6,953.63 as a claim allegedly entitled to administrative expense priority under § 503(b)(9) of the Bankruptcy Code. The claims agent appointed by the Court designated this claim as Claim No. 249. Pursuant to the Court's order on the Debtor's Fifth Omnibus Objection, the Defendant's claim was reclassified as a general unsecured claim. Order on Debtor's Fifth Omnibus Objection to Certain Misclassified Non-Goods 503(B)(9) Claims [Docket No. 4008 in Case No. 08-35653]. The Parties have agreed that Claim No. 249 (as reclassified by the Court's order) shall be allowed in the amount of $6,953.63. Stipulation of Undisputed Facts, ¶ 16 [Docket No. 11].

## Discussion

Section 547(b) of the Bankruptcy Code permits a trustee to avoid certain payments made by a debtor to a creditor within the ninety-day period immediately preceding the Petition Date.[6]

---

[6] Section 547(b) states:

11 U.S.C. § 547(b).  The avoidance of such preferential transfers "promotes the 'prime bankruptcy policy of equality of distribution among creditors' by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate . . . [as well as] discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor and offers a concurrent opportunity for the debtor to work out its financial difficulties in an atmosphere conducive to cooperation." *Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 797-98 (4th Cir. 1991) (citation omitted).

A trustee may not, however, avoid a transfer "to the extent that the transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee or (B) made according to ordinary business terms."  11 U.S.C. § 547(c)(2).  The trustee has the burden of proving the avoidability of a transfer under § 547(b), and the creditor against whom recovery is sought has the burden of proving the nonavoidability of the transfer under § 547(c).  11 U.S.C § 547(g).

The Defendant here concedes that the Preference Payments constitute preferential transfers under § 547(b).  Stipulation of Undisputed Facts, ¶¶ 18-23 [Docket No. 11].  The Defendant further concedes that the $3,432 transfer that was made 189 days after the date of

---

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made—
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition,
    if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if—
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Invoice 27414 was not paid in the ordinary course of business and is not subject to the protections of § 547(c) of the Bankruptcy Code. Stipulation of Undisputed Facts, ¶ 24 [Docket No. 11]. The sole issue remaining for the Court to determine is whether the three other transfers made within the Preference Period in payment of Invoices 27514, 27509, and 27548 are excepted from avoidance under the ordinary course of business defense of § 542(c)(2)(A).[7]

The Bankruptcy Code does not define the phrase "ordinary course of business." The legislative history discussing § 547(c)(2) of the Bankruptcy Code simply states that the "purpose of this exception is to leave undisturbed normal financial relations, because [permitting the continuation of normal relations] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S. Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874. As financial relations will invariably differ among parties, the Fourth Circuit has held that this inquiry "is peculiarly factual." *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 486 (4th Cir. 1992) (citing *In re First Software Corp.*, 81 B.R. 211, 213 (Bankr. D. Mass. 1988)). The Court must therefore analyze the particular business relationship and course of conduct of the parties to determine whether the Preference Payments at issue here were indeed ordinary.

The Trustee argues that the Court should consider the entirety of the relationship between the Debtor and the Defendant to determine the proper benchmark from which to measure whether the Preference Payments were made in the ordinary course of the parties' conduct. A review of the entire course of dealing between the parties in accordance with this argument

---

[7] While the Defendant's answer cites § 547(c)(2) generally, the stipulation of facts, the Defendant's trial memorandum, and the Defendant's oral argument are completely devoid of any discussion of ordinary business terms used in the relevant industry. As the Defendant has the burden of proof on this matter, the Court will treat the potential defense afforded by § 547(c)(2)(B) as abandoned.

reveals an abrupt thirteen-day increase in the average elapsed time between the issuance of an invoice and the receipt of payment beginning at the onset of the Liquidity Event in November 2007. The Trustee thus maintains that the ordinary course of business between the Debtor and the Defendant is best evidenced by the payment history that occurred prior to the onset of the Debtor's financial distress in November 2007.

The Defendant prefers that the Court adopt and apply an arbitrary twelve-month lookback period immediately preceding the Preference Period. Relying on decisions in other courts that applied a similar twelve-month lookback period, the Defendant argues that the parties' conduct during this period will provide an accurate indication of the ordinary course of business between the parties. Such an approach, however, would ignore the Fourth Circuit's observation that the ordinary course inquiry is "peculiarly factual." Artificially limiting a court from reviewing the full course of conduct between two parties would unnecessarily hamstring a court's ability to determine the true ordinary course of conduct. Each case must be viewed and judged according to its peculiar factors, which does not lend itself to such a rigid scheme.

Furthermore, the cases cited by the Defendant do not support its contention that a twelve-month lookback period should be applied in all cases. The Court of Appeals for the Eighth Circuit used a twelve-month lookback period in *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir. 1991), because the record only contained twelve months of pre-preference period data. The court found that the data set available to it was sufficient to determine the course of business between the parties, but it did not discuss whether it would have restricted its inquiry to this twelve-month period had further data been available. *Lovett*, 931 F.2d at 498.

*Branch v. Ropes & Gray (In re Bank of New England Corp.)*, 161 B.R. 557 (Bankr. D. Mass. 1993) countenanced a twelve-month lookback period for similar reasons. The relationship

7

between the parties in *Branch* began a mere nine months before the preference period. The court found that the available data was "an appropriate standard for determining the ordinary course of business between parties." *Branch*, 161 B.R. at 560. While the court in *Richardson v. Pana Limestone Quarry Co. (In re Leprechaun Trucking, Inc.)*, 356 B.R. 190 (Bankr. C.D. Ill. 2007), also found that the twelve-month period preceding the preference period is an appropriate standard citing *Lovett* and *Branch*, it did not actually apply this standard to the case. Rather, the court held that a radical change in payment practices six months before the preference period constituted an "unusual payment or collection activity" that precluded the application of § 547(c)(2). *In re Leprechaun Trucking, Inc.*, 356 B.R. at 201. In sum, the cases cited by the Defendant establish merely that a twelve-month lookback period may be permissible. None of the cited cases holds that such a period is either required or even preferable.

The Court concludes that the approach advocated by the Trustee best accords with established Fourth Circuit precedent and most accurately establishes the ordinary course of business between the parties in this case. The leading Fourth Circuit case addressing the ordinary course of business defense of 11 U.S.C. § 547(c)(2) is *Advo-System, Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir. 1994). Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) in 2005, § 547(c)(2) of the Bankruptcy Code required that a transfer had to be made both in the ordinary course of business or financial affairs of the debtor and the transferee *and* according to ordinary business terms in order to obtain the protection of § 547(c)(2).[8] The court in *Advo-System* was charged with determining whether a

---

[8] Pre-BAPCPA § 547(c)(2) prohibited a trustee from avoiding a transfer:
    to the extent that such transfer was--
        (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
        (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
        (C) made according to ordinary business terms.

8

preferential transfer was excepted from avoidance pursuant to § 547(c)(2) despite the fact that the course of conduct of the parties varied from the objective ordinary business terms of the relevant industry.

The Fourth Circuit adopted the approach established by the Third Circuit Court of Appeals in *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods. Inc.)*, 18 F.3d 217 (3d Cir. 1994). That case applied a sliding-scale test to the "ordinary business terms" inquiry of subsection (C) of § 547(c)(2) of the Bankruptcy Code. Under this test, a business relationship of short duration or without a clearly established course of conduct between the parties under subsection (B) would require a more rigorous adherence to the ordinary business terms of the relevant industry under subsection (C) in order to enjoy the protections of § 547(c)(2). Conversely, a business relationship with a long history during which the terms of the parties' performance had not substantially changed would permit substantial deviation from the ordinary business terms of the relevant industry while remaining within the permissible bounds of § 547(c)(2). *Advo-System, Inc.*, 37 F.3d at 1049.

While post-BAPCPA § 547(c)(2) now excepts preferential transfers from avoidance either if they are made in the ordinary course of business or financial affairs of the debtor and the transferee *or* if they are made in accordance with ordinary business terms, *Advo-System* remains controlling with regard to the instant case. The court in *Advo-Systems* based its sliding-scale analysis on the *preinsolvency* course of dealing between the parties, not the pre-preference course of dealing between the parties. *Advo-System, Inc.*, 37 F.3d at 1049 ("[S]ubsection C countenances a greater departure from that range of terms [representative of the industry norm] the longer the *preinsolvency relationship* between the debtor and creditor was solidified. . . . The

---

While BAPCPA relaxed the requirements of § 547(c)(2) by restating the two prong affirmative defense test in the disjunctive, *Advo-System* remains clearly relevant to the alternative tests set forth in the amended statute.

more cemented (as measured by its duration) the *preinsolvency relationship* between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2).") (quoting *In re Molded Acoustical Prods. Inc.*, 18 F.3d at 220, 225) (emphasis added). Although the ordinary course of business inquiry is now a standalone test and is no longer viewed against the parties' conformance with ordinary business terms, the use of the preinsolvency period to determine the ordinary course of conduct between parties has not been altered and remains applicable.

This Court will follow *Advo-System* and utilize the onset of the Debtor's financial distress in November 2007 as the baseline from which to determine the ordinary course of business of the parties. While the specific time at which the Debtor became legally insolvent has not been established in this proceeding,[9] the Court finds the shift in payment practices that occurred as a result of the liquidity crisis to be sufficiently analagous to deem the Liquidity Event as marking the cessation of ordinary business practices. Regardless of whether the Debtor was in fact insolvent or simply changing its payment practices in reaction to its slide towards insolvency, the business practices of the Debtor were no longer ordinary after the Liquidity Event.

The change that occurred in the Debtor's payment practices after the Liquidity Event is stark. Prior to the Liquidity Event, the Defendant received payment on average 33.49 days after its invoice date. While these payments range from thirty-one to forty-one days after the invoice date, only three of the thirty-nine relevant payments occurred more than thirty-six days after the invoice date. Following the Liquidity Event, the Defendant received payment on average 46.74 days after its invoice date. No payment was made less than forty-four days after the invoice date. The lack of any overlap in the number of days between invoice date and payment date

---

[9] The Stipulation of Undisputed Facts states only that the Debtor experienced a liquidity crisis in November 2007 that caused it to delay payment on invoices submitted by vendors and that the Debtor was insolvent when the Preference Payments were made.

10

between the two periods reflects a marked change in payment practices by the Debtor in response to its liquidity issues. Delaying payments to a vendor by nearly two weeks as a result of liquidity concerns patently establishes that relations between the Debtor and the Defendant were no longer ordinary and that a new paradigm had arisen in response to the Debtor's financial difficulties.

When the period preceding the Liquidity Event is compared to the Preference Period, it is clear that the Preference Payments received by the Defendant were not made in the ordinary course of business between the parties. The 82.75 day average of the days-to-pay during the Preference Period was nearly three times as great as the days-to-pay during the period preceding the Liquidity Event. Even if Invoice 27414 (which was paid 189 days after the invoice date) is excluded from the analysis, the three remaining Preference Payments were made twelve to eighteen days later than payments had been made on average prior to the Liquidity Event. The increase in the time the Debtor took to make payments following the Liquidity Event reflects a strategy adopted by the Debtor to fend off bankruptcy. As such, the Preference Payments were not ordinary and the Defendant cannot benefit from the protection of § 547(c)(2).[10]

## Conclusion

The Defendant having conceded that the Preference Payments constitute preferential transfers under § 547(b) of the Bankruptcy Code and the Court having found that the Preference

---

[10] The Defendant argues that a twelve to eighteen day increase in the time it took the Debtor to pay invoices during the Preference Period is not so significant a change as to preclude the application of §547(c)(2). The Defendant relies on *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728 (Bankr. W.D. Va. 1995). There, the court did find that preference payments made on average thirteen days later than the pre-preference period payments were made in the ordinary course of business. But the parties had a very different course of dealing in *Valley Steel*. The days-to-pay varied significantly, ranging from twenty-six to 119 days after invoice. Conversely, in this case the payments in the period preceding the Liquidity Event were all made within a very narrow range. There was also no overlap in the timing of payments between the relevant periods in this case as there was in *Valley Steel*. Viewed in this light, the Court finds that the twelve to eighteen day difference between the average time it took the Debtor to make the pre-Liquidity Event payments and the time it took the Debtor to make the Preference Payments is significant and precludes the application of § 547(c)(2).

Payments are not excepted from avoidance under § 547(c) of the Bankruptcy Code, the Preference Payments will be avoided. As the Defendant has also stipulated that it was the immediate transferee of the Preference Payments, the avoided Preference Payments are subject to recovery under 11 U.S.C § 550. Judgment will be entered in favor of the Debtor in the amount of $124,261.

A separate order shall issue.

ENTERED: _____

       /s/Kevin R. Huennekens
UNITED STATES BANKRUPTCY JUDGE